ANN E. BARTON, Appellant, *v.* PATRICK LYNCH and JOHN MOORE, Respondents.

*A deed, absolute in form — degree of proof required to show it to be a mortgage.*

The evidence required to show that a deed, absolute in form, was intended to be a mortgage, must be clear, unequivocal and convincing; and when an oral defeasance is relied upon for this purpose, its existence must be established beyond a reasonable doubt.

The fact that the grantor in a deed, absolute in form, understood the transaction to be a mortgage, is not alone sufficient to prove it to be so, in the absence of fraud or mistake.

If a deed, absolute in form, was not, at its execution, intended to be a mortgage, it is not competent for the grantor therein to show by parol that the deed was, in fact, executed in trust for his benefit.

APPEAL by the plaintiff, Ann E. Barton, from a judgment of the Supreme Court, entered in the office of the clerk of Onondaga county on the 6th day of January, 1892, upon a decision of the court, rendered at the Onondaga Special Term, dismissing the complaint upon the merits.

*W. G. Tracy,* for the appellant.

*'iscock, Doheny & Hiscock,* for the respondents.

MERWIN, J.:

On or about the 9th of May, 1879, the plaintiff, then being the owner of certain real estate in the city of Syracuse, executed and delivered to

---

* The other decisions of this term will be found in 68 Hun. — [REP.

HUN — VOL. LXIX.     1

the defendants a conveyance thereof, which was dated May 6, 1879, acknowledged May 9, 1879, and recorded May 10, 1879. The husband of the plaintiff, Joseph Barton, joined in this deed as one of the parties of the first part. The consideration therein stated was $37,000, and it purported also to convey all leases and rents from May 1, 1879. The parties of the first part covenanted that the premises were free and clear of all incumbrances, except two mortgages, one for $25,000 and interest from July 1, 1878, to the Onondaga County Savings Bank, and the other for $10,000 and interest to the Syracuse Savings Bank. The deed also contained the usual covenant of warranty. The present action was commenced May 4, 1889, and its object is to have the deed above described declared to be a mortgage, and to obtain redemption and an accounting of rents and profits.

The premises in question were situated on Genesee street, with a frontage of about 132 feet, and in or before 1868 Joseph Barton became the owner thereof at the cost of about $29,000. In 1868 or 1869, at an expense of about $80,000, he built thereon a block, having six stores upon the first floor, and in the upper part there being rooms and offices and a large opera house. In order to obtain in part the means for the erection of this block, Barton and his wife executed the two mortgages above referred to, one being dated February 12, 1868, and the other July 28, 1868, and together they covered the whole block, each being upon a distinct portion. Bonds executed by Joseph Barton accompanied the mortgages. In 1878, and for some years before, insurance was carried on the building of $90,000, and then, and for some time previous, the premises had been assessed at $53,000. On the 7th of June, 1874, Joseph Barton executed and delivered to his wife, the plaintiff, his bond for the payment of the sum of $26,000 in one year, and as security therefor a mortgage upon the said premises for the same amount. This sum was the amount agreed upon as due the wife upon a settlement between her and her husband of certain business transactions. This mortgage was afterwards foreclosed by Mrs. Barton by action. Upon the sale under the judgment, Mrs. Barton became the purchaser at the price of $1,000, and a deed was given to her on July 31, 1875. The plaintiff's title upon this sale was subject to the lien of the two savings bank mortgages. For the deficiency upon plain-

tiff's debt, a judgment was entered against Joseph Barton on the 19th of October, 1875, for $27,197.33. Immediately upon the foreclosure sale the plaintiff took possession, and so continued until the deed to defendants, the husband meanwhile managing and controlling the property for her as her agent.

About the time of the foreclosure action Joseph Barton failed in business. On the 19th of November, 1875, a petition in bankruptcy was filed against him upon which he was adjudged a bankrupt and thereafter, on the 5th day of March, 1878, he received in that proceeding a discharge from his debts. Meanwhile, the business of manufacturing and selling cigars and tobacco, which before his failure he had carried on in one of the stores of the block, was carried on at the same place by the firm of J. Barton, Jr., & Co., which was composed of the plaintiff and her oldest son, Joseph Barton, Jr. When Joseph Barton was discharged in bankruptcy in March, 1878, the plaintiff withdrew from the firm and her husband took her place, the name of the firm then becoming J. Barton & Son, and the business was continued at the same place. The business of J. Barton & Son was not successful, and in March, 1879, the firm was in failing circumstances with debts amounting to about $25,000 and with assets of the value of from $12,000 to $15,000, about one-half of which was the stock and property in the store and the other half was in accounts. The principal creditor was one Crawford whose debt was about $16,000, and who was pressing for payment. At this time and for some years prior thereto the defendant Lynch was and had been a banker in the city of Syracuse, and connected with various banking institutions, at which Joseph Barton and the firms succeeding him had been accustomed to do business and procure discounts upon the credit to a considerable extent of Lynch. The latter had also assisted Barton on previous occasions in procuring settlements with his creditors, for which assistance he had been paid by Barton. In the spring of 1879 Lynch held or was liable upon a note of J. Barton & Son for $5,000, which was the only indebtedness to him of Joseph Barton or of any member of his family, and it had existed for some time, and was amply secured by a mortgage of $8,000, dated March 4, 1874, executed by the plaintiff and her husband to Lynch upon a house and lot in Syracuse, the title of which was in the plaintiff and the value of which exceeded

$20,000. The debt of Crawford above referred to was in two notes, one for about $15,000 and the other about $1,400. On the 20th of April, 1879, the defendant Lynch, at the request of Joseph Barton, and after negotiations between Barton and Crawford and between Lynch and Crawford, which were commenced about the first of April, purchased the larger note for the sum of about $1,500. Upon this note, Lynch, on the 29th of April, 1879, commenced a suit in the Supreme Court against J. Barton & Son, and on the 26th of May, 1879, recovered a judgment thereon for $15,370.21 damages and costs. Execution was at once issued thereon, and levy made upon the stock of J. Barton & Son, and the same was sold at public sale in the first week of June, and bid in by Mrs. Barton for about the sum of $2,100. She paid nothing upon the bid except the fees of the sheriff. She immediately took possession of the property and continued the business in her own name. Upon the judgment, proceedings supplementary to execution were instituted and a receiver appointed to whom the accounts of the firm were assigned. Joseph Barton was made agent of the receiver for the collection of the accounts, and he with his son, Frank E. Barton, proceeded to the collection of the same. From the proceeds of such collections, Lynch was paid the amount he had paid for the claim and interest, and also the sum of $300 charged by his attorney for the prosecution of the claim. This was all that Lynch received from the proceeds of the judgment, and on the 8th of November, 1886, he assigned the judgment to William E. Barton, a son of plaintiff.

The facts, thus far stated, are substantially as found at Special Term, and are not disputed. It is also found that the purchase by Lynch from Crawford and the subsequent proceedings thereon were in pursuance of an arrangement between Joseph Barton and Lynch by which Barton, in order to obtain a transfer of the stock and property of J. Barton & Son to the plaintiff, and a continuance of the business in her name, requested Lynch to purchase the Crawford claim as cheaply as possible, put it into judgment, sell upon execution the leviable property of which plaintiff should be the purchaser, and collect the accounts, and that when reimbursed for his disbursements, the balance of the judgment and its avails should belong to Joseph Barton or some member of his family, and that Lynch assented to this proposition. There is abundant evidence to

sustain this finding. The existence of such an arrangement in substance is hardly disputed by the plaintiff, but the claim on her part is, there is more of it and that the arrangement in fact made included not only the Crawford claim but the subject of the block, its mortgages and repairs and the deed in controversy.

From the time the plaintiff acquired title to the block in 1875, to the spring of 1879, the rents of the premises were not collected by the plaintiff, but by her husband or her son, Joseph Barton, Jr., and were turned into and used in the business carried on by them, and from the business the plaintiff and her family received their support. In the spring of 1879 the interest upon the savings banks mortgages that fell due January 1, 1879, and the taxes for the year 1878 were unpaid, and the opera house needed considerable and extensive alterations. The plaintiff claims that it was then verbally agreed between Lynch and the plaintiff and her husband, that Lynch should advance the sums necessary to buy up and compromise the debts of Joseph Barton & Son, advance money to pay interest on the mortgages, indorse for the plaintiff when she succeeded to the business of Joseph Barton & Son, as then contemplated, advance what moneys were needed to put the opera house in better shape and make it pay better, and as security for such advances take a deed of the block, and that when his advances were repaid out of the block or by plaintiff, with compensation for his services, he would reconvey the block to the plaintiff, and that in pursuance of this arrangement the Crawford claim was bought and the deed to defendants given.

The court declined to find this arrangement. On the contrary, it was found that in the latter part of 1878, and to May, 1879, the receipts from the premises for rents and for the use of the opera house, that occupied the upper stories of the block, were not equal to the expenses of the property for interest on the mortgages, taxes, insurance, water rents and repairs; that rents and the value of real estate in the city were considerably depressed and property difficult of sale at its value; that by reason of these things and the need of alterations to the opera house and the arrears in interest and taxes, Joseph Barton, the husband of the plaintiff and her managing agent for this property, was of the opinion that it was for the interest of plaintiff to sell the premises at a price not less than the incum-

brances, which then, with interest and taxes, amounted to $37,000; that in the spring of 1879 Joseph Barton personally, and by others, offered the premises for sale at sums ranging from $40,000 to the amount of the incumbrances, or $37,000, but was unable to find a purchaser, and at last offered the same to the defendant Lynch at the last-named sum, which was accepted by Lynch upon the defendant Moore agreeing to unite with him in the purchase; that in pursuance of this offer and acceptance the deed was given, the defendants verbally agreeing to pay the incumbrances and taxes and save the plaintiff and her husband harmless therefrom, which agreement was performed by defendants; that this deed was executed and delivered with intent to convey thereby to defendants an absolute estate in fee.

Immediately upon the execution and delivery of the deed the defendants took possession of the premises and have ever since been in possession, claiming to hold as absolute owners, as the court finds. The plaintiff, in continuing the business after the execution sale, remained at the same store in the block as previously occupied by J. Barton & Son, but at a fixed monthly rent agreed upon between her and the defendants and paid by her to the defendants. This continued for about a year, when, by direction of defendants, she left. She, however, continued the business elsewhere until 1886, when she failed and made a general assignment. A reassignment was made to her under an order of court in March, 1888.

The defendants, about the 1st of July, 1879, wishing, as the court finds, to improve their title to the premises and cut off any claims that the creditors of Joseph Barton might have, requested the holders of the savings banks mortgages to foreclose the same, as they were past due. This was accordingly done by actions in the Supreme Court, Joseph Barton and his wife being parties defendant with others. Judgments of foreclosure were obtained in each case, and a public sale made by the sheriff on November 1, 1879, and the property in each case was struck off to the defendants at the amount due upon the mortgage, and the costs, that being the highest sum bidden and they being the highest bidders. Deeds were given by the sheriff to the defendants in pursuance of the sales. Prior to May 1, 1880, the defendants spent, in repairs and improvements upon the opera house and block, about $30,000, and about $45,000

prior to 1888. In September, 1888, the block was partially destroyed by fire, and the defendants received for insurance the sum of $47,000, a portion of which was for loss on personal property. The whole amount of insurance on the building was about $35,000. Soon after this, the plaintiff caused a demand to be made upon the defendants for an accounting and a reconveyance, and again, in April, 1889, shortly before the commencement of this suit.

The main claim of the appellant is that, upon the evidence, she was entitled to the finding that the deed was given as security. The agreement, if any to that effect, was verbal, and is sought to be shown from the negotiations between the plaintiff and her husband with Lynch, or from declarations of Lynch, and also divers surrounding circumstances are shown as bearing upon the probability of such an agreement. So far as the evidence rests in proof of negotiations or declarations, it is conflicting. Upon the one side, the plaintiff and her husband give their recollections of what was said at divers interviews between them and Lynch, and they are corroborated, more or less, by the testimony of their three sons, Joseph Barton, Jr., William E. Barton and Frank E. Barton. The defendant Lynch denies all the material portions of their testimony. The manifest interest of the plaintiff and her husband and sons was an element on the question of credibility. Besides, the reputation of Joseph Barton was specially attacked, and it appeared that the sons, William E. and Frank E., were the owners of judgments against their mother to the amount of about $30,000, and, since the commencement of this action, a receiver of the property of the mother had been appointed for their benefit. It is claimed that the plaintiff's theory is corroborated by a witness, Heyne, who testifies that in 1881 Lynch said to Mrs. Barton that he didn't see any reason why she shouldn't have the block back in a few years. Circumstances, however, were shown, as to this witness and his evidence, that would make it evidently proper for the trial court, who saw the witness and heard his evidence, to fix the weight to be given to his evidence, and the like may be said as to the evidence of the witness Hamilton. So that, as to all these witnesses, the trial court, having seen them and heard them testify, had better opportunity than we have to determine the weight to be given to their evidence. In view of this, it would not be appropriate for us to interfere

with the conclusion of that court, unless there exists some decisive circumstance or circumstances in favor of plaintiff's theory outside of the verbal negotiations or declarations. The plaintiff claims that such circumstance does exist in the value at the time of the block. The consideration of $37,000 stated in the deed was made up of the amount of the mortgages and interest and taxes, so that plaintiff received nothing beyond the incumbrances. Several witnesses are called by her who state that, in their judgment, the block was then worth from $65,000 to $80,000. One of these witnesses was city assessor at the time, and had occasion to then consider the value of the property. In 1878, it was assessed at $53,000. The other witnesses do not seem to have had their attention particularly called to the value in 1878 or 1879. Evidence was also given tending to show that the rents for 1878 were considerably in excess of the expenses, including interest and taxes. Upon the other hand, several witnesses are called by the defendants, who place the market value in the spring of 1879, at from $35,000 to $40,000. Five of these witnesses had occasion to examine the property in the spring of 1879, with a view of forming a judgment of its value, and they profess to speak upon the information then obtained. The defendants also gave evidence tending to show that the rents for 1878 and 1879 were not sufficient to pay the expenses, including interest and taxes, so that there was no margin of profit to the owner. It was shown that the block in 1879 was assessed at $35,000; and in 1880, after the defendants had expended $30,000 in improvements upon it, it was assessed at $50,000. It may be assumed that in 1868, when the savings banks mortgages were given, the block was deemed to be worth double the amount of those mortgages. There is, however, some evidence that in the spring of 1879, not only was payment of the interest pressed, but payment of a portion of the principal was asked for.

The evidence justifies the finding that Barton, in the spring of 1879, made efforts to sell the block, but was unable to find a purchaser at any sum above the incumbrances. The evidence would justify a finding that the market value did not, in the then state of the market, exceed the amount paid by the defendants. Barton had been managing the property for many years, in connection with his business, but did not seem to make a success of it. He failed in

1875, and was again about to fail. Concededly, the block needed repairs or improvements. One of the plaintiff's witnesses testifies that in one of the interviews with Lynch, Barton told Lynch that he had tried to raise money by mortgage, but did not succeed. If repairs were needed, and money could not be raised by mortgage, it reflects somewhat not only on the value of the property, but of the rental. We think the evidence justifies the finding made by the court below that in the latter part of the year 1878, and to May, 1879, the receipts for rents and use of the property were not equal to the expenses for interest on mortgages, taxes, insurance, water rents and repairs.

Inadequacy of price in cases of this kind is always a circumstance to be considered (1 Story Eq. §§ 245, 246 ; 1 Jones on Mort. § 329 ; *Holmes* v. *Grant*, 8 Paige, 243), and the weight to be given to it depends upon the degree of inadequacy. If in the present case the market value of the property at the time of the deed did not substantially exceed the consideration, the element of inadequacy ceases to be of any practical importance.

There are some other circumstances that may be briefly adverted to. It will be observed that the transfer by Crawford to Lynch was on 20th of April, 1879, while the deed was not given till May 9, 1879. No other debt of the firm was purchased by Lynch or compromised by him, The deed was drawn by Lynch and sent to Barton on May 6, 1879. On May 8, 1879, Lynch wrote to Mr. Barton to return the deed and that he didn't want it executed. Instead of doing this Barton and his wife executed the deed and sent it to Lynch. Barton in his evidence testifies that before the date of the deed propositions as to the block had been exchanged between him or his wife and Lynch, but that nothing definite had been concluded upon. If that be so, it may be argued with some force that the giving of the deed was entirely separate from any agreement for the compromise of debts.

A part of the agreement between plaintiff and Lynch, as claimed by plaintiff, was that Lynch should indorse for her, upon her continuing the business. Still, very soon after she commences business, and on the 13th of June, 1879, she gives to Lynch a mortgage of $10,000 upon her house and lot upon which the $8,000 mortgage

above referred to had been given, and also upon other real estate owned by her, and this was as collateral security to Lynch for all money he might advance to her and for any notes he had or might have against her or might indorse for her benefit. This mortgage was recorded July 3, 1879. Lynch thereupon indorsed for her benefit in her business or helped her get credit to more or less extent until August, 1885, when he declined to indorse farther and demanded payment of the $5,000 note given by J. Barton & Son, and for which he held the $8,000 mortgage. Upon this note being paid, Lynch upon the 18th of August, 1885, canceled both mortgages. It is claimed that the giving of the $10,000 mortgage was inconsistent with the claim of plaintiff that the deed was given partially for the same purpose. It apparently has some force in that direction.

At the time of the deed there was no debt in existence from plaintiff to Lynch, nor was she liable upon the bonds given with the savings banks mortagages. She did not become liable to pay to Lynch any of the moneys which he might expend upon the buildings. If there was a loss, she was not liable. But, as she claims, she had an option, for an indefinite period in the future, to call for an accounting and redemption. The defendants immediately took full possession, plaintiff becoming for a time a tenant, and after she left friendly relations seemed to have continued between the parties until 1885. In the meantime, the defendants expended largely for improvements, far more, it is claimed, than a mortgagee in possession would be likely to do, and after the fire in 1888 they rebuilt at an expense of $100,000 and upwards.

The circumstance that the defendants, after receiving the deed, procured the foreclosure of the mortgages is not necessarily inconsistent with their claim of absolute ownership. The atmosphere about the mortgage under which plaintiff claimed title was not entirely clear. The plaintiff when she took it knew, as she herself testifies, that her husband had got to fail. The manner in which the block had been managed might give opportunity for a question as to who was the real owner. The withdrawal of the wife from the firm was only about a year previous. It was certainly discreet to perfect title before making costly permanent improvements.

The plaintiff claims that as upon the giving of the deed she obtained nothing over and above the incumbrances and taxes, she would not

be likely to make an absolute conveyance. Upon the other hand, it is said that the management by the plaintiff and her family was not a success; none of them had means or ability to properly carry it on, and, therefore, the only option plaintiff had was either to allow it to be sold on foreclosure of the mortgages, or make the conveyance to the defendants, and that the fact that under the circumstances then existing she and her husband chose to convey to defendants is not inconsistent with the absolute conveyance. The defendants were business men, and it is urged that they would not be likely to take a defeasible conveyance, running all the risk of large expenditures and liable to be prevented from enjoying the profits.

The evidence required to show that a deed absolute in form was intended to be a mortgage, must be clear, unequivocal and convincing. (*Cadman* v. *Peter*, 118 U. S. 73; *Erwin* v. *Curtis*, 43 Hun, 292; 112 N. Y. 660.) In *Ensign* v. *Ensign* (120 N. Y. 655), it is said that the existence of an oral defeasance must be established beyond a reasonable doubt. In *Lance's Appeal* (112 Penn. St. 467), it is said that "to convert a deed, absolute on its face, into a mortgage by parol testimony, such testimony must be clear and specific, of a character such as will leave in the mind of a chancellor no hesitation or doubt, and, failing this, the effort to impeach the legal character of the deed must be regarded as abortive." The testimony must be entirely plain and convincing beyond reasonable controversy. HUNT, J., in *Howland* v. *Blake* (97 U. S. 626). The fact that the grantor may have understood the transaction to be a mortgage is not alone sufficient to prove it to be so, in the absence of fraud or mistake. (1 Jones on Mort. § 335.)

In view of the strict rule of evidence applicable to such cases, and of the fact that in some features of the case the credibility of witnesses was at issue, which was a matter that could be dealt with by the trial court better than by this court, we fail to find any sufficient reason for interfering with the finding that the deed in question was executed and delivered with intent to convey to the defendants an absolute estate in fee. There are no circumstances in the case so decisive in favor of plaintiff's theory as to require us to overturn the decision of the trial court.

If the deed at its execution was not intended as a mortgage, then, within the authority of *Sturtevant* v. *Sturtevant* (20 N. Y. 39), it

would not be competent for plaintiff to show by parol that the deed was in fact, in trust for her benefit.

Our attention is called to some exceptions to rulings upon evidence. Error is claimed in the admission of certain declarations of Joseph Barton. There was evidence that the management and control of the block while the plaintiff held the title was left by her entirely with her husband, and that he had full charge and management of her business then and afterward until she failed, and that he was in fact her general agent. Evidence was received of his declarations as to the block in the negotiations that led up to the deed, and of the interviews between him and Lynch with reference to indorsements for plaintiff in the business after the deed, and in fixing the rent of the store to be used in plaintiff's business, and as to leasing some portion of the block before the deed. The declarations of Barton, in transactions within the scope of his authority, would bind the plaintiff. (Story on Agency, § 134.) Within this principle, no material error is apparent.

There are no other questions that call for special consideration. It follows that the judgment should be affirmed.

HARDIN, P. J. and MARTIN, J., concurred.

Judgment affirmed, with costs.